Robert SCHAUB, Plaintiff,

v.

CONSOLIDATED FREIGHTWAYS,
INC. EXTENDED SICK PAY
PLAN, Defendant.

No. IP 94–488 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Aug. 4, 1995.

David W. Gray, Lewis & Kappes, Indianapolis, IN, for plaintiff.

Michael G. Paton, Howard E. Kochell, Barnes & Thornburg, Indianapolis, IN, for defendant.

BARKER, Chief Judge.

Robert Schaub (the "Plaintiff") contends that Consolidated Freightways Inc. Extended Sick Pay Plan (the "Defendant" or the "Plan") violated ERISA § 503, 29 U.S.C. § 1133 (1985), by failing to provide adequate notice of Schaub's alternatives when the Plan terminated Schaub's long-term disability benefits. Schaub also contends that the Plan acted arbitrarily or capriciously in terminating his benefits with no more evidence of his employability than his doctor's assertion that Schaub could take on "light duty" work. The Plan argues that it met the notice requirements and made a reasonable decision. Both parties have moved for summary judgment. For the reasons explained below, the Court denies the Defendant's motions and grants the Plaintiff's.

Schaub also argues that he relied on the terms of the Summary Plan Document (the "Summary") and that the Summary allowed Covered Employees to work part-time and still receive disability benefits. (*See* Ex. C at 64.) Because the Court grants relief under the terms of the plan document itself, we do not decide any further claims arising from the Summary.

## I. Background

The parties have stipulated to the following facts: Consolidated Freightways, Inc. ("CF") employed Schaub as a truck driver since 1980. CF maintains an Extended Sick Pay Plan that provides covered Employees with income while they are totally disabled. The Plan is subject to the requirements of ERISA, 29 U.S.C. § 1001 et seq. (1985 & Supp.1995).

The plan document defines "total disability:"

When, as a result of sickness or injury, a Covered Employee becomes wholly and continuously disabled, and is under the regular care of a legally qualified physician, and is prevented by reason of said sickness or injury from engaging in any occupation, employment, or job for wage or profit for which he is reasonably qualified by training, experience or education, said Employee shall be deemed to be totally disabled for purposes of this Plan and shall be entitled to benefits hereunder....

(Ex. B at 2.) The plan document also provides that an employee is no longer a Covered Employee when he or she ceases to be "actively at work for the Company," except that an employee who is totally disabled continues as a Covered Employee until the last day he or she receives extended sick pay. (*Id.*)

Schaub went on medical leave from CF on January 2, 1991. (Ex. A–3.) He consulted Dr. Tim Taber. (Ex. A–1.) On February 7, 1991, the Plan sent Schaub a form to provide written proof of disability. (Ex. A–3.) The Plan received this form, filled out partly by Schaub and partly by Dr. Taber, on February 27, 1991. On the form, Dr. Taber described Schaub's condition as "chronic renal insufficiency" with an elevated thyroid function and a slight limitation of heart function. Dr. Taber dated Schaub's continuous inability to work from January 1, 1991, and checked the appropriate places to indicate

that Schaub was "totally disabled" for "any occupation/light duty" beginning at a date described as "unknown!!". (Ex. A–6 at 2.) The Plan accordingly granted Schaub extended sick pay through March, 1991. (Ex. A–10 at 1.)

After receiving copies of the doctor's notes from Schaub's office visits through March 11, the Plan wrote Dr. Taber, defining "totally disabled" and asking four specific questions about Schaub's condition.

An employee is considered to be totally disabled if he is unable to perform the duties of his own or any occupation, employment or job for which he is reasonably qualified by training, education or experience....

1. After reviewing the definition of disability in the first paragraph above, do you feel [Schaub] has been totally disabled continuously from March 11 to the present time?

2. If yes, please indicate the specific medical reasons he is unable to perform a light duty position such as a desk job.

3. If you feel he has not been totally disabled the entire time, please indicate the earliest date you feel he was capable of performing a light duty position.

4. If you feel [Schaub] is totally disabled at the present time, please estimate the earliest date you feel he will be capable of performing either a light duty or his regular position.

(Ex. A–8 at 1–2.)

Dr. Taber wrote back to the Plan and asserted: "It is my feeling that [Schaub] is able now to return for light duty.... [I]n time, he will need to be either dialyzed or transplanted. This is not an immediate problem, but will arise in the near future." (Ex. A–9 at 1.) Dr. Taber also returned a supplementary inquiry form on which he checked the appropriate places to indicate that he believed Schaub to be "totally disabled from regular occupation," but not "totally disabled from *any* occupation." (Ex. A–9 at 2.) Dr. Taber described the "type of job patient could perform" succinctly as "light duty!!" (*Id.*) Dr. Taber checked that

Schaub's condition was "improved," but not "recovered" and gave the date on which Schaub "can return to full time work" as "unknown." (*Id.*)

The Plan then wrote Schaub, informing him that he was "no longer considered to be totally disabled" and that, therefore, he was no longer eligible for the Extended Sick Pay Plan. (Ex. A–10.) In addition, since CF had no light duty work for him, Schaub was no longer eligible for any employee benefit plans. (*Id.*)

Schaub was eligible for Continuation Coverage of his health insurance. He enrolled in this program, paying his insurance premiums himself. (Ex. A–12 at 2.) No doubt he used this insurance because in September, 1991, Schaub had a kidney transplant, (Ex. A–14), and later suffered a "[h]eart attack resulting in burst artery in the heart that cannot be corrected," (Ex. A–11).

Schaub also applied for, and received, disability benefits from the Social Security Administration. Under the terms of the Plan, Social Security benefits would offset Extended Sick Pay benefits and the Plan requires disabled employees to apply for them. (Ex. C at 63; Ex. B at 7.)

When the continued health benefits expired in October, 1992, (Ex. A–12 at 2), Schaub appealed the April, 1991 denial of benefits under the Extended Sick Pay Plan, (Ex. A–11). He submitted the Social Security Administration determination as additional evidence of his continued disability. Though the deadline to appeal the denial of a benefit claim was sixty days, (Ex. C at 142), the Plan processed Schaub's appeal as if it were timely. The review committee concurred in the original denial of benefits. (Ex. A–13.)

## II. Analysis

### A. Standards of Review

#### 1. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed.R.Civ. Proc. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Krawczyk v. Harnisch-feger Corp.*, 41 F.3d 276, 278 (7th Cir.1994).

## 2. Standard for Substantive Review of Benefit Decisions

When an ERISA plan denies or terminates a participant's benefits, and the plan document grants the administrator discretion "to determine eligibility for benefits or to construe the terms of the plan," the denial or termination is subject only to deferential review. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). The parties here agree that the Plan had such discretion.[1] They disagree as to the meaning of the deferential standard.

Plaintiff argues that the appropriate standard is whether the Plan's decision was "reasonable." (Pl.'s Answer Br.Resp.Def.'s Mot.Summ.J. at 2.) Defendant argues that the standard is whether the decision is arbitrary and capricious. (Def.'s Br.Supp.Mot. Summ.J. at 14.) The Court will not split this hair. *See Lister v. Stark*, 942 F.2d 1183 (7th Cir.1991) (refusing to split the semantic hair between 'abuse of discretion' and 'arbitrary and capricious'); *Springs Valley Bank & Trust Co. v. Carpenter*, 885 F.Supp. 1131, 1136 (S.D.Ind.1993) (holding there is insignificant, if any, difference between reasonableness and the arbitrary and capricious standard). The standard, by whatever name, requires this Court to defer to the Plan's decision unless the decision was unreasonable. The Plan must still consider the factors that are relevant to the important aspects of the decision, and articulate an explanation that makes a "rational connection" between the issue, the evidence, the text and the decision made. *Cuddington v. Northern*

*Ind. Pub. Serv. Co.*, 33 F.3d 813, 817 (7th Cir.1994) (citing *Exbom v. Cent. States, S.E. & S.W. Health & Welfare Fund*, 900 F.2d 1138, 1142–43 (7th Cir.1990)). *See also Krawczyk*, 41 F.3d at 279 (citing *Pokratz v. Jones Dairy Farm*, 771 F.2d 206 (7th Cir. 1985)); *Russo v. Health, Welfare & Pension Fund*, 984 F.2d 762, 765 (7th Cir.1993) (requiring a "decision [ ] based on a reasonable interpretation of the plan's language and the evidence of the case"); *Pokratz*, 771 F.2d at 209 (requiring the Plan's decision to "offer a reasoned explanation, based on the evidence, for a particular outcome").

## 3. Standards for Procedural Review of Benefit Decisions

The Court reviews an ERISA plan's notice of denial or termination of benefits in light of ERISA § 503, 29 U.S.C. § 1133, and other applicable regulations. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (citing 29 C.F.R. § 2560.503–1(f)).

### a. Strict Compliance

In general, the regulations "afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." *Id.* at 689. Specifically, meaningful review requires that beneficiaries " 'know[ ] what evidence the decision-maker relied upon, hav[e] an opportunity to address the accuracy and reliability of that evidence, and hav[e] the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.' " *Halpin*, 962 F.2d at 689 (quoting *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir.1986), *cert. denied* 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987)).

### b. Substantial Compliance

Under certain circumstances, substantial compliance with the statutory and

---

**1.** The plan document provides: "All questions of interpretation or construction of this Plan shall be resolved solely and conclusively by the Committee, or its appointed delegate, and its decision shall be final and binding." (Exhibit B, p. 10.) The Plan thus possesses discretion to interpret terms. Similar grants have been sufficient to trigger the arbitrary and capricious standard for terminations of benefits. *See Halpin v. W.W.*

*Grainger, Inc.*, 962 F.2d 685 (7th Cir.1992) (grant of discretion over "the administration, interpretation and operation of the Plan" imposed the deferential standard of review over determinations of benefits); *Jones v. Iron Workers Dist. Council*, 829 F.Supp. 268, 271 (S.D.Ind.1993) (power to "construe" provisions and terms imposed the deferential standard of review over termination of benefits).

regulatory requirements is sufficient. Specifically, when the notice of denial or termination at issue antedates 29 C.F.R. § 2560–503–1(f), only substantial compliance with the regulations is necessary to insure compliance with the statutory requirements. *Wolfe v. J.C. Penney Co., Inc.,* 710 F.2d 388, 392 (7th Cir.1983); *Sage v. Automation, Inc. Pension Plan and Trust,* 845 F.2d 885, 892 (10th Cir.1988). Also, when the employee had all the information necessary to take full advantage of her opportunity for review, and the issue is only whether the information was included in the notice letter itself, the notice's substantial compliance with the regulations will be acceptable. *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 382–83 (7th Cir. 1994). *See Brown,* 797 F.2d at 536 (inadequate notice, accompanied by minutes indicating the basis for their decision, the items considered by the retirement committee, and the assessment and weight given the items, "was sufficient to substantially comply with" regulations). Finally, where the procedural defects are so slight that they do not merit a substantive remedy, and when additional evidence supports the denial of benefits, substantial compliance with the regulations may be sufficient. *Hancock v. Montgomery Ward Long Term Disability,* 787 F.2d 1302, 1308 (9th Cir.1986). *See also Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1096 (9th Cir.1985) (where beneficiary would not receive a substantive remedy, "no remand is necessary as it would be a useless formality").

### B. Procedural Violations

The requirements for notice of a denial of benefits are set out in § 503 of ERISA:

In accordance with the regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review

by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. Regulations, linking the two statutory requirements, require that the initial notice of a denial include:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f) (1994). *See Halpin,* 962 F.2d at 689. These regulations are substantially duplicated in the plan document. (Ex. B at 9.)

### 1. The Notice to Schaub

In the first notice that anything had gone wrong with his disability benefits, Schaub received a letter from the Plan:

As you know, the CF Extended Sick Pay Plan provides long term disability income benefits to employees who are totally disabled or wholly and continuously disabled by illness or injury. An employee is considered to be totally disabled if he is unable to perform the duties of his own or any occupation employment or job for which he is reasonably qualified by training, education or experience.

When your attending physician, Dr. Tim Taber, initially completed and returned your Extended Sick Pay Benefits Request form on February 22, 1991 he failed to enclose copies of the chart notes as had been requested on the form. Copies were subsequently requested from his office first on March 8, 1991 and again on March 19, 1991. When the copies were received, they included the office notes through March 11th. Based on this information, Extended Sick Pay Benefits were paid through the end of March. However, ad-

ditional information was needed to substantiate any payment past that time.

We have subsequently received information from Dr. Taber indicating he feels you are capable of returning to a light duty position as of April 15, 1991. When an employee is declared able to perform the duties of a light duty position, he is no longer considered to be totally disabled and ceases to meet the eligibility criteria of the Extended Sick Pay Plan. We have contacted your work location and verified that there is no light duty work available for you at this time. When an employee does not return to work after losing eligibility under the Extended Sick Pay Plan, his benefits under this and all other employee benefit plans, including but not limited to the Health Plan, life insurance, and Pension Plan, must end. Your benefits will end as of the date of this letter which is April 24, 1991. All benefits will be reinstated once you do return to work.

.     .     .     .     .

If you have any questions, or wish to discuss this further, please do not hesitate to call me.

(Ex. A–10.)

Schaub argues that the Plan's letter fails to meet the statutory and regulatory requirements because it did not convey a sufficiently precise understanding of the reasons for the termination to permit Schaub to take advantage of his opportunity for review. In addition, he argues, the Plan did not specify what kind of information would help Schaub perfect his claim for benefits. In short, Schaub argues that the Plan has violated 29 C.F.R. § 2560.503–1(f)(1) and (3), and consequently has violated, § 503 of ERISA, 29 U.S.C. § 1133(1).

**2. Strict Compliance**

Interestingly, the Plan argues that there were two reasons for Schaub's termination, each based on Dr. Taber's later communications. According to the Plan, the definition

**2.** *See also Halpin,* 962 F.2d at 696 (" 'A *post hoc* attempt to furnish a rationale for a denial of . . . benefits in order to avoid reversal on appeal, and thus meaningful review' is not acceptable," (cit-

of 'totally disabled' in the plan document has three elements: an employee must "(1) Be wholly and continuously disabled as a result of sickness or injury; (2) Be under the regular care of a legally qualified physician; and (3) Be prevented by reason of said sickness or injury from engaging in any occupation, employment or job for wage or profit for which he is reasonably qualified by training, education or experience." (Def.'s Answer Br.Pl.'s Mot.Summ.J. at 23.) ("Def.'s Answer Br.") The Plan argues that Dr. Taber's letter, together with his marks on the supplementary inquiry form, (Ex. A–9), show both that, as of April 15, Schaub was not wholly and continuously disabled and that he was not prevented from engaging in some occupation. (Def.'s Answer Br. at 23.)

**a. Wholly and Continuously Disabled**

■ The Plan clearly did not meet the statutory and regulatory notice requirements with regard to its conclusion that Schaub was not wholly and continuously disabled. The Plan's letter to Schaub initially distinguishes "wholly and continuously disabled" from "totally disabled." (Ex. A–10 ¶ 1.) It then discusses only total disability and Schaub's ability to perform light duty work. There is no hint that the denial resulted from a determination that Schaub was not wholly or continuously disabled. There is no description of additional evidence Schaub might submit on the issue, and no explanation of why such evidence would be necessary. If this were the only ground for denying Schaub's benefits, the Plan's notice to Schaub would fail to provide "an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." *Halpin,* 962 F.2d at 689.[2]

**b. Totally Disabled**

■ The Plan's letter to Schaub does provide an abbreviated definition of "totally disabled." (Ex. A–10 ¶ 1.) It also specifically refers to the eligibility criteria of the Extended Sick Pay Plan, (*Id.* ¶ 3), thus meeting

ing *Short v. Central States, S.E. & S.W. Areas Pension Fund,* 729 F.2d 567, 575 (8th Cir. 1984))).

regulation (2). Schaub does not complain that the instruction to call with questions or discussion, (*Id.* final ¶), was inadequate information as to steps to take to submit a claim for review. The Court therefore assumes that the notice meets regulation (4).

Nevertheless, the letter fails to describe the later information received from Dr. Taber. Without more specific information about what the doctor said, as required by regulation (1), Schaub could hardly "address the accuracy and reliability of that evidence." *Halpin,* 962 F.2d at 689. *See also Wolfe,* 710 F.2d at 392 ("The 'reason' given for denial is not a reason but a conclusion.").

Furthermore, the Plan's letter fails meet regulation (3), because it fails to describe additional information that might be relevant to the determination that Schaub could perform light duty work. Certainly new information from Dr. Taber, clarifying his remarks would have been relevant. (*See* Def.'s Answer Br. at 21.) Moreover, the Plan does sometimes consider information beyond the supplementary inquiry form. When an employee's doctor certifies that an employee is totally disabled, the Plan conducts independent evaluations, first enlisting another doctor, then a third if necessary, and finally performing a "vocational assessment." (Ierulli Aff. ¶¶ 3–4.) Without the information that such additional evidence would carry authority with the review committee, Schaub was not " 'able to address the determinative issues and have a fair chance to present his case' ". *Donato,* 19 F.3d at 381 (quoting *Halpin,* 962 F.2d at 689).

### 3. Substantial Compliance

■■■ Under certain circumstances, an ERISA plan need not strictly comply with § 503 and the regulations. When all the necessary information is conveyed by means other than the notice letter, or when the evidence shows that forcing the Plan to reconsider would be a useless formality, substantial compliance with the statute and regulations is sufficient. *See, supra,* Part II(A)(3)(b). Even on this more lenient standard of review, however, the Plan must "afford the beneficiary and the courts a sufficiently precise understanding of the ground for the denial to permit a realistic possibility of review." *Halpin,* 962 F.2d at 694.

The Plan fails to meet even this relaxed standard. This is not a case like *Brown,* or like *Donato,* where additional information accompanied the notice, supplementing the beneficiary's understanding of the Plan's reasons and requirements. *Brown,* 797 F.2d at 535; *Donato,* 19 F.3d at 382. Rather, this is a case like *Halpin,* 962 F.2d 685.

In *Halpin,* the plan failed to comment on medical evidence in its possession that weighed against its conclusion that the beneficiary was able to work. *Id.* at 694. Similarly, the Plan in this case possessed medical evidence that raised doubts about its conclusion that Schaub was able to work. Dr. Taber's letter stated that Schaub would soon need dialysis or transplantation. (Ex. A–9.) Yet the Plan did not address that information in its notice to Schaub.

Also in *Halpin,* the plan failed to disclose why it did not investigate the beneficiary's actual employment opportunities before concluding that he was able to work. *Halpin,* 962 F.2d at 696–97. Similarly in this case, the Plan concluded that Schaub was able to work, but did not disclose its reasons for ignoring the actual job market. CF had no sufficiently light work for a man about to undergo dialysis and a transplant. The Plan failed to disclose why it thought other employers would have. Just as the plan in *Halpin* failed the substantial compliance standard, 962 F.2d at 694, the Plan here fails as well.

### C. Substantive Violations

■■■ In addition to his procedural claim, Schaub contends that the Plan's decision to terminate his disability benefits was unreasonable. To review such a claim, the Court looks to see whether the Plan (1) considered the factors relevant to the decision, and (2) articulates an explanation that makes a "rational connection" between the issue, the evidence, the text and the decision made. *See, supra, Cuddington,* 33 F.3d at 817.

### 1. The Plan's Decision

The Plan's internal procedures for terminations of disability benefits rely heavily on

reports from the beneficiary's own physician. Where the physician checks the appropriate spot on a supplementary inquiry form to indicate that the patient is not disabled, the Plan finds the patient not disabled. (Def.'s Br.Supp.Mot.Summ.J. at 6–7; Ierulli Aff. ¶¶ 3–5.) Only when the patient's own physician indicates that the patient is totally disabled does the Plan consult other medical authorities or vocational experts. (Ierulli Aff. ¶¶ 3–5.) Thus, while the Plan sometimes counts additional medical evidence and vocational experts as relevant to a determination that an employee is totally disabled, it argues that "the best evidence that an individual is *not* totally disabled is an opinion from his or her physician to that effect." (Def.'s Answer Br. at 22.)

In the present case, the Plan relies on the letter and supplementary inquiry form returned by Dr. Taber. (Def.'s Answer Br. at 8.) Dr. Taber knew how the Plan defined "totally disabled" since the Plan's request for additional information told him. "An employee is considered to be totally disabled if he is unable to perform the duties of his own or *any occupation*, employment or job for which he is reasonably qualified by training, education or experience." (Ex. A–8 at 1 (emphasis added).) The Court must therefore read Dr. Taber's response that Schaub "is able to return for light duty," (Ex. A–9), and his mark on the form indicating that Schaub is not "now totally disabled from *any* occupation," (*Id.*), as Dr. Taber's opinion that Schaub could find suitable light employment. Since Dr. Taber's only expertise is in medicine, however, his remarks constitute only a medical opinion of Schaub's employability.

■ Moreover, Dr. Taber's opinion is equivocal. His letter to the Plan warns that "in time, [Schaub] will need to be either dialyzed or transplanted. This is not an immediate problem, but will arise in the near future." (Ex. A–9.) His comments and marks on the preprinted form indicate that Schaub "is now totally disabled from regular occupation" and that Schaub "can return to full time work on" an unknown date. (*Id.*) The Court must therefore consider that the Plan had knowledge that Schaub was still not in perfect health. Given these facts, the issue before the Court is whether, under the "any occupation" definition of total disability, the Plan acted reasonably in terminating Schaub's disability benefits given only equivocal evidence from Schaub's physician.

### 2. "Any Occupation" Disability

The Seventh Circuit has not directly considered the scope of the factors relevant to the termination of benefits under an "any occupation" definition of disability. In *Halpin,* the court set aside the issue of whether an employer must investigate the actual job market to determine "any occupation" disability, because the plan's procedural failings made review of the administrator's substantive decision impossible. *Halpin,* 962 F.2d at 697. The Seventh Circuit discussed "any occupation" disability again in *Hammond v. Fidelity and Guar. Life Ins. Co.,* 965 F.2d 428 (7th Cir.1992), and restricted the interpretation of such policies. "Although broad in scope, ['any occupation'] disability provisions should not be construed so literally that an individual must be utterly helpless to be considered disabled. Rather, the insured should be entitled to recover provided he or she is unable to perform all the substantial and material acts necessary to the prosecution of some gainful business or occupation." *Hammond,* 965 F.2d at 431. *See also Torix v. Ball Corp.,* 862 F.2d 1428, 1431 (10th Cir. 1988) (holding that "a reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances.").

In considering substantive benefits decisions, other circuits have held that it would be unreasonable for a plan to terminate disability benefits under an "any occupation" plan without expert advice specifically on the beneficiary's ability to find work. In *Gunderson v. W.R. Grace Long Term Disability Income Plan,* 874 F.2d 496 (8th Cir.1989), for example, the court held that "before terminating benefits, the Plan *should have* obtained a vocational expert's opinion to determine if Gunderson is presently capable, in light of his physical impairment, to perform 'any occupation.' " *Id.* at 499 (emphasis add-

ed). In *Moore v. Harris Corp.*, 813 F.Supp. 1556 (M.D.Fla.1993), *aff'd*, 22 F.3d 1098 (11th Cir.1994), the court held that "[a]ny decision prior to [receiving an opinion from a vocational rehabilitation expert] ... was *arbitrary and capricious* since not based on substantiated evidence of not only [the beneficiary's] medical condition but of her ability to engage in employment with the physical limitations placed on her and her mental condition." *Id.* at 1559 (emphasis added).

The strongest language on the subject appears in *Jenkinson v. Chevron Corp.*, 634 F.Supp. 375 (N.D.Cal.1986).

> *Logic dictates* that a determination as to whether the "any occupation" definition of disability has been met by a claimant requires consideration of two types of evidence. First, there must be evidence as to the medical condition or degree of impairment of the claimant. Additionally, there must be evidence as to the existence of jobs for those of the claimant's qualifications, or potential qualifications, in light of his or her impairment.

*Id.* at 379 (emphasis added).

The Plan argues that an opinion from an employee's own physician is the best evidence that an employee is not totally disabled. In certain circumstances, this may be true. As the *Jenkinson* court said "there may be no need for vocational evidence where there is indication of [ ] no impairment...." *Id.* at 379 n. 3. But this is not a case where, once released from the physician's care, the patient is able to resume his normal occupation. Here, the Plan knew that Schaub would soon require dialysis or a transplant. Additionally, Dr. Taber's release emphasized that Schaub could perform only light duty, and not his regular work.

In summary, the Seventh Circuit limits deference toward plan interpretations of 'any occupation' disability. Other circuits have ruled that, to deny benefits under "any occu-

pation" disability policies, ERISA plans require both medical and vocational information. The Plan here knew of Schaub's pending dialysis or transplant, but relied on the physician's opinion that Schaub could perform "light duty!!". (Ex. A–9 at 2.) At no time did the Plan consider what occupation Schaub could perform in his contemporaneous medical condition. Accordingly, the Court finds that the Plan unreasonably determined that Schaub was not "totally disabled." The Plan has failed to consider the factors relevant to their decision.[3] *See Cuddington*, 33 F.3d at 817.

### D. Conclusion

For the reasons given above, the Court grants the Plaintiff's motion for summary judgment on the claim that the Defendant violated the procedures outlined in ERISA § 503. The Court also grants the Plaintiff's motion for summary judgment on the claim that the Defendant unreasonably terminated his disability benefits. The Court denies the Defendant's motions for summary judgment on both claims.

### III. Remedies

#### A. Reinstatement of Benefits

Having found that the Plan violated ERISA § 503, the procedural requirements for notice of denial of benefits, the Court has some discretion in determining the appropriate remedy. Where the plan's action was an initial denial of benefits, and where the plan submits additional evidence to the court that the procedurally flawed denial of benefits was substantively correct, the Court may simply remand for a new benefits determination. *See Halpin*, 962 F.2d at 697 (citing *Wolfe*, 710 F.2d at 390). But where "[s]ignificant procedural errors occurred", *Halpin*, 962 F.2d at 697, and the plan's decision was to terminate benefits previously granted, the Court may order a reinstatement of those benefits. *See Id.* at 697

---

**3.** The Plan also argues that the termination of Schaub's benefits was reasonable because Dr. Taber's marks on the supplementary inquiry form showed that Schaub was no longer "wholly and continuously disabled." (Def.'s Answer Br. at 9.) The Court finds any termination of Schaub's benefits on these grounds would also be unreasonable based on the record before the

review committee. The Plan has failed to provide any rational connection between its decision, Schaub's medical condition, and this term. The Plan says only "[b]ased on Dr. Taber's opinions, which is the only evidence of Plaintiff's condition, Plaintiff failed to satisfy the first and third requirement for total disability...." (*Id.* at 10.)

(reinstating benefits terminated four years before).

■ Here, the Plan's decision was to terminate benefits already granted. (Ex. A–10 at 1.) Reinstating Schaub's benefits therefore only restores him to the position he occupied before the Plan's decision. Moreover, the Plan's procedural errors significantly contributed to the parties' failure to resolve this issue through the internal appeal structure. A detailed description of the information that would be relevant in an appeal of the termination might have led Schaub to appeal the decision sooner, and to seek the appropriate opinions from his physicians. This also suggests that the Court should reinstate Schaub's disability benefits. *See, supra, Halpin,* 962 F.2d at 697.

In addition, the Plan's procedural errors, and Schaub's subsequent medical deterioration, complicate any attempt to repair, at this late date, the unreasonable termination of his benefits. Since the termination of his disability benefits, Schaub has suffered a transplant, (Ex. A–14 at 1), and a heart attack, (Ex. A–11 at 1). Deciding now if he would be employable four years ago would be speculative. If Schaub had known that evidence of employability would affect the Plan's decision, Schaub could have sought such evidence in 1991.

For the reasons given, the Court orders the Defendant to reinstate Schaub's benefits under the Extended Sick Pay Plan, retroactively to the time of termination. The Plan may continue to monitor Schaub's condition and employability to determine his continued eligibility.

### B. Attorney's Fees

■ Finally, Schaub claims that he is entitled to attorney's fees. ERISA provides that, in cases brought to recover benefits, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In applying its discretion to this kind of action, the Court may employ either of two tests. One includes five factors: (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of at-

torney's fees; (3) whether or not an award of attorneys' fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *Anderson v. Flexel, Inc.,* 47 F.3d 243, 250 (7th Cir.1995) (*"Flexel"*). Alternatively, the Court may apply the *Bittner* test which "creates a modest presumption ... in favor of awarding reasonable attorney's fees to the winning party ..." and looks to whether "the loser's position, while rejected by the court, had a solid foundation—more than merely not frivolous, but less than meritorious." *Bittner v. Sadoff and Rudoy Industries,* 728 F.2d 820 (7th Cir.1984).

The choice is illusory: under either approach the question is " 'was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?' " *Flexel,* 47 F.3d at 251 (quoting *Meredith v. Navistar Int'l Transp. Corp.,* 935 F.2d 124, 128 (7th Cir. 1991)). "Harassment" in this standard is not to be taken too literally. It does not require any finding of subjective bad faith; rather, it implies only that the losing party's litigation position was not substantially justified. *Production and Maintenance Employees' Local 504 v. Roadmaster Corp.,* 954 F.2d 1397, 1405 (7th Cir.1992).

The Court finds the Defendant's litigation position in this case to be substantially justified within the meaning of this standard. The Seventh Circuit has not previously ruled on whether an ERISA plan may disregard actual evidence of employability in administering an "any occupation" disability plan. In the absence of clear precedent on that issue, the Defendant's argument that it acted reasonably had a solid foundation. *See, supra, Flexel,* 47 F.3d at 250–51. Similarly, the argument that the Plan had substantially complied with ERISA procedures, while not meritorious, had a solid foundation in the law of this Circuit.

For the reasons given, the Court denies the Plaintiff's plea for attorney's fees.

## IV. Conclusion

For the reasons given above, the Court grants the Plaintiff's motion for summary judgment on both the procedural and the substantive ERISA claims. The Court denies the Defendant's motion for summary judgment on both claims. The Court also denies the Plaintiff's plea for attorney's fees.

It is so ORDERED.

## JUDGMENT

In accord with its entry of this date, the Court grants the Plaintiff's motion for summary judgment against the Defendant, Consolidated Freightways Inc. Extended Sick Pay Plan on the claim that Defendant violated ERISA § 503. The Court also grants the Plaintiff's motion for summary judgment on the claim that the Defendant unreasonably terminated the Plaintiff's long-term disability benefits. The Court orders the Defendant to reinstate Plaintiff's disability benefits as of the date of termination. The Court denies the Defendant's motions for summary judgment on both claims. Each side is to bear its respective costs.

It is so ORDERED.